IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

MAURICE WALKER,

Petitioner,

v.

Civil Action No.
9:03-CV-0550 (TJM/DEP)

JOSEPH T. SMITH,

Respondent.

---

APPEARANCES: OF COUNSEL:

FOR PETITIONER:

MAURICE WALKER, *Pro Se*

FOR RESPONDENT:

HON. ANDREW M. CUOMO
Office of Attorney General
New York State Attorney General
The Capitol
Albany, NY 12224

STEVEN H. SCHWARTZ, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Petitioner Maurice Walker, a New York State prison inmate as a result of a 1999 Albany County conviction for murder and burglary, has commenced this proceeding pursuant to 28 U.S.C. § 2254, seeking this

court's habeas intervention. In his petition, Walker asserts four distinct grounds for relief, arguing that 1) his constitutional rights to equal protection and due process were violated through the use of a prosecutor's peremptory challenges to exclude minority members from the trial jury panel; 2) through a series of evidentiary rulings and prosecutorial misconduct, he was denied a fair trial; and 3) his constitutional rights were abridged when the trial court refused his request to suppress statements allegedly given to law enforcement officials involuntarily, and without the presence of legal counsel.

Having carefully reviewed petitioner's arguments, applying the requisite, deferential standard, I find no basis to conclude that the state courts, which addressed and rejected the majority, though not all, of petitioner's arguments, ruled contrary to, or unreasonably applied, clearly established Supreme Court precedent.

## I. BACKGROUND

### A. Facts Surrounding The Soto Murder

_____Petitioner's conviction stems from the June, 1996 murder of John Soto, a known drug dealer, in Albany, New York. Trial Transcript at pp.

117-22.[1] Between 7:30 and 8:00 a.m. on June 8, 1996, Soto was discovered by a friend alive, but lying in a pool of blood with a bullet wound to the head. TT 143-45, 150-55. Soto later died on June 11, 1996 from injuries resulting from the gunshot. TT 194.

There were no eyewitnesses to the shooting itself. One individual, however, Kenneth Van Epps, testified that on several occasions during the day of the murder he observed a dark colored car pull up to the curb in front of Soto's apartment. At one of those times, Van Epps witnessed a man getting out of the car, covering his head, and running up the back stairs to the porch of Soto's apartment house, later returning to the vehicle. TT 177. On the last occasion when the vehicle was seen in the vicinity, Van Epps witnessed both a passenger and the driver get out of the car, cover their heads, walk up to the porch, and go into Soto's apartment, coming out moments later, entering the car and leaving. TT 173-80, 183.

B. The Post-Murder Investigation

Upon investigation it was determined that the petitioner, who at the

[1] The transcript, which is both separately provided and included within the state court record on appeal, though with different pagination, will be cited herein as "TT __." References to other portions of the record on appeal will be made as "RA at ___."

time resided in Staten Island, New York, was stopped on the evening of June 6, 1996 in the City of Albany for having failed to comply with a posted stop sign.[2] TT 222-27. Following a lead provided by an individual who had been arrested on drug-related charges, police officers located Andre Roldan who, after being interviewed, provided information regarding the Soto homicide in return for an agreement of allowing him to plead guilty to a charge of burglary and receive a predisposed sentence of between three and six years in prison. TT 269, 653-54.

At trial, Roldan testified that on the afternoon of June 7, 1996, he and his father, Hector DeJesus, went to Soto's apartment to purchase heroin. TT 236-37. According to Roldan, the vehicle they drove at the time was a dark green 1996 Grand Am. TT 238. Upon entering the apartment, the pair were told that Soto had sold all of his drugs, but was planning to make a trip to New York City with the accumulated drug proceeds in order to replenish his supply. TT 238-39.

Roldan recounted that he, DeJesus, and the petitioner later met at

---

2 The stop sign infraction stop provided evidence of a parole violation committed by the petitioner, who was prohibited under the terms of his parole, administered from Staten Island, New York, from entering Albany without permission from his parole officer. TT 478-80.

DeJesus' home and formulated a plan to rob Soto of his acquired drug proceeds. TT 239-40. Roldan stated that he and the petitioner, each armed with a 9 millimeter handgun, drove in Roldan's dark green rental car to Soto's apartment on the evening of June 7, 1996 and knocked on the door. TT 245-48. After forcing entry into the premises, Roldan went to the front room looking for money; while there, he heard a gunshot from the room where he had left the petitioner with Soto, later entering the room and finding the victim shot. TT 249-54.

An autopsy performed on the victim's body revealed that Soto was killed by a single gunshot to the head, fired at relatively close range. TT 194-218. From the aggregate weight of the projectile fragments recovered, a forensic firearms examiner was able to determine that the gun used to fire the fatal bullet was larger then .32 in caliber. TT 638 - 41. In or about September of 1996 law enforcement officers, utilizing all of the evidence gathered up until then during the course of their investigation, including Roldan's statement, applied to the court and obtained search warrants for both an Albany residence and an address in Staten Island. TT 557-58. On September 5, 1996, armed with one of those warrants, Albany Detectives Sean Keane and Valerie Burke,

together with Albany Parole Officer James Contino, traveled to Staten Island and met with petitioner's parole officer, John Bruno, and the Parole Bureau Chief, William Steinhoff, seeking that agency's assistance in executing the warrant. TT 478-82. While at petitioner's apartment building, poised to execute the warrant, Officer Contino and a local law enforcement officer encountered the petitioner exiting the building's elevator on the ground floor. TT 560-61. Walker was immediately taken into custody and administered his *Miranda* warnings.[3] TT 561. The subsequent execution of the search warrant at petitioner's apartment yielded considerable evidence and contraband, including drugs and firearms with accompanying ammunition. TT 564-73, 663; RA I at 22-23.

Following his arrest, petitioner was transported to a Staten Island police station, where he was initially questioned by law enforcement personnel from Albany. TT 493-502. During the course of that questioning petitioner admitted being acquainted with Hector DeJesus, and knowing who Andre Roldan was, and additionally acknowledged ownership of the weapons found in the apartment. TT 498-500. After being fed and permitted to speak with his girlfriend, TT 501, 526-28,

---

3 *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966).

petitioner was additionally interviewed by Staten Island detectives, and then held in custody pending a local court appearance. AT 528-30.

Petitioner was arraigned the following morning on charges stemming from the discovery of weapons in his apartment.[4] Petitioner was released by the court in his own cognizance and remanded to the custody of Parole Officer Contino in connection with violation of parole charges. TT 504-05. Petitioner was later transported to Albany, where the parole violation hearing was to be held. AT 505-06.

After his arrival at the Albany Police Department headquarters, petitioner and law enforcement officials entered into discussions concerning his parole. TT 510-11. During those talks, Walker indicated that he desired to have an attorney representing him at his final parole hearing, but did not request the immediate presence of an attorney with respect to the matter, nor did he at any time signal a desire not to speak with law enforcement officers. TT 512-16, 545-46.

Following the completion of a conversation between Officer Contino and the petitioner, a City of Albany Police Department detective

---

4 Although the record is somewhat equivocal on this score, it appears that petitioner was assigned counsel at the time of his arraignment. See TT 37, 88-90; RA I at 37-38.

spoke with the defendant, first readministering *Miranda* warnings and receiving a response that Walker understood his rights, and was willing to speak with the detective. TT 755-57. During that interview, petitioner acknowledged that he, Roldan and Hector DeJesus had driven to Johnny Soto's house on June 6, 1996 for the purpose of buying drugs. TT 757-58. Petitioner was then processed on the parole violation charge, and placed in a cell for the evening. TT 761-62.

Petitioner was further interviewed by Albany detectives on the following morning, after again having been apprised of his *Miranda* rights. During that questioning, after being confronted with the substance of Roldan's information, Walker confessed to the Soto murder and subsequently signed a detailed sworn written statement providing his version of the relevant events. TT 762-73, 783-91.

## II. PROCEDURAL HISTORY

### A. State Court Proceedings

On December 13, 1996, an Albany County grand jury returned a eight count indictment charging petitioner with two counts of first degree murder, in violation of N.Y. Penal Law § 125.27 (counts one and two); three counts of second degree murder, in violation of N.Y. Penal Law §

125.25 (counts three, four and five); burglary in the first and second degrees, in violation of N.Y. Penal Law §§ 140.30 and 140.25, respectively (counts six and seven); and conspiracy in the fourth degree, in violation of N.Y. Penal Law § 105.10(1) (count eight). RA I at 3-10. In anticipation of a trial on the charges lodged against him, on or about February 25, 1997 petitioner moved pursuant to N.Y. Criminal Procedure Law § 710 seeking suppression of certain evidence for use in connection with the prosecution against him. In that motion, *inter alia,* petitioner challenged the admissibility of statements made by him to law enforcement authorities, alleging them to have been involuntary and elicited in violation of his right to counsel under both the federal and state constitutions.[5] Following an extensive suppression hearing conducted over three non-contiguous days, *see* RA II at 1-425, Albany County Court Judge Thomas A. Breslin issued two decisions on January 8, 1999, and a third four days later on January 12, 1999, addressing the various aspects of petitioner's suppression motion. RA I at 52-76.

Petitioner's challenge to the statements given by him to law

---

[5] In his motion, petitioner also sought suppression of physical evidence obtained during the search of his residence, pursuant to a warrant, as well as evidence seized from his person, and additionally challenged identification testimony to be offered against him.

enforcement authorities was addressed in the third of the three omnibus decisions issued by the trial court, this one dated January 12, 1999. RA I at 66-76. Based upon the suppression hearing, the trial court made certain findings in support of its decision to deny the suppression application. *Id.* The trial court found that Walker, having lawfully been taken into custody, was questioned by Albany authorities for approximately two hours on the evening of his arrest, and thereafter by New York City police officers inquiring regarding the evidence and contraband recovered from his apartment. After being arraigned on weapons and drug charges, filed based upon the recovery of the contraband from his apartment, petitioner was transferred into the custody of parole officials and transported to Albany, where he was questioned by those officials for two hours on the day following his arrest, and approximately three hours on the next day. RA I at 67-69. Petitioner was provided with food and drink at both locations, was given the opportunity to sleep overnight at the Albany police station, and was permitted to make a telephone call. RA I at 69. The trial court also found that petitioner was advised of his *Miranda* rights before each period of questioning. RA I at 69-70.

Applying its findings to the governing legal principles regarding the constitutionally guaranteed right to counsel, the trial court concluded that the pendency of the parole warrant, acting as a detainer, did not constitute significant judicial activity such as to trigger petitioner's right to counsel in connection with that charge.[6] RA I at 70-71. While it appears that petitioner completed a form provided to him by law enforcement authorities, indicating his request that counsel be appointed to represent him in connection with any parole revocation hearing, the trial court found that law enforcement officials were neither aware of that request nor advised by the petitioner at any point of his desire to have an attorney present for questioning.[7] RA I at 68-74. Concluding that state constitutional principles do not preclude law enforcement officials from

---

[6] The trial court reasoned that because petitioner was released on his own recognizance in connection with the Staten Island charges, during the relevant times he was in custody solely as a result of the pending parole violation charge. RA I at 71-72.

[7] That form provided to the petitioner included instructions advising that in the event the parolee could not afford counsel and wished to have one assigned at his or her preliminary hearing, the individual should sign and detach the form at the perforation, additionally informing that responsibility for mailing the form to the address shown – in this case the Albany County Public Defender's Office – rested with the parolee. RA I at 68. While petitioner apparently did complete the form, advising of his request for assigned counsel, it was not received by the Albany County Public Defender until some months later, on July 21, 1997. *Id.* The trial court found that at no time did petitioner advise law enforcement authorities in Albany of his request for counsel, made on the parole form. RA I at 73-74.

questioning a suspect arrested on a matter for which he or she is represented by counsel regarding a separate, only tangentially related crime for he or she is a suspect, the trial court held that the action of law enforcement officers in eliciting statements from the petitioner did not abridge his right to counsel.[8] RA I at 73-76.

A jury trial was conducted in Albany County Court in connection with the charges set forth in the indictment against the petitioner, beginning on March 8, 1999, with County Court Judge Thomas A. Breslin presiding. TT 1-1503. At the close of trial, petitioner was acquitted of the highest two counts, but convicted of two counts of murder in the second degree, and additionally a single count of first degree burglary. TT 1492-94. Petitioner was subsequently sentenced on those convictions on April 28, 1999, principally to concurrent, indeterminate terms of incarceration of between twenty-five years and life on the counts of conviction. RA V at 1527-29.

Petitioner appealed his conviction to the New York State Supreme Court Appellate Division, Third Department. In that appeal, Walker 1) challenged the issuance of the warrant authorizing a search of his

---

[8] In its decision, the trial court did not make reference to the federal constitution or Sixth Amendment jurisprudence.

apartment and the trial court's failure to suppress the fruits of that search, alleging violation of his rights under both the state and federal constitutions; 2) argued that his state and federal constitutional rights to counsel were violated through the interrogation procedures which led to his confession; 3) alleged that he was denied a fair trial as a result of various trial court rulings and prosecutorial misconduct; and 4) challenged the trial court's rejection of his arguments related to the prosecution's efforts to excluded minority representation on the jury. Petitioner's appeal resulted in the issuance by that court of a memorandum decision, dated July 5, 2001, rejecting petitioner's various arguments and unanimously confirming his conviction. *See People v. Walker,* 285 A.D.2d 660, 727 N.Y.S.2d 731 (3d Dep't. 2001). Leave to appeal that determination to the New York State Court of Appeals was denied on November 29, 2001, *People v. Walker,* 97 N.Y.2d 659, 737 N.Y.S.2d 60 (2001), and a subsequent petition for *certiorari* review by the United States Supreme Court was denied by that court on May 13, 2002. *Walker v. New York,* 535 U.S. 1064, 122 S. Ct. 1932 (2002). Petitioner has not initiated any state court proceedings collaterally challenging his conviction.

B. This Proceeding

Petitioner commenced this proceeding on May 5, 2003 with the filing of a petition, accompanied by a legal memorandum more fully outlining his grounds for seeking habeas relief. Dkt. Nos. 1, 2. In his petition Walker asserts claims falling into three general categories, contesting 1) the state court's denial of his challenge to the prosecution's exclusion of minority representatives from the jury; 2) prosecutorial misconduct and various of the trial court's evidentiary rulings which, he maintains, had the cumulative effect of depriving him of the right to a fair trial; and 3) the trial court's failure to suppress his confession. *See id.* Properly named as the respondent in Walker's petition is Joseph T. Smith, the superintendent of the facility in which he was confined at the time of commencement. *Id.* With the filing of an answer and legal memorandum in opposition to the petition by the New York State Attorney General, acting on behalf of the respondent, Dkt. Nos. 6, 7, and submission of a reply, or "Traverse", memorandum by petitioner on August 7, 2003, Dkt. No. 8, this matter is now ripe for determination, and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Standard Of Review

Enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), brought about significant new limitations on the power of a federal court to grant habeas relief to a state court prisoner under 28 U.S.C. § 2254.[9] Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir. 2001) (quoting § 2254(e)(1)) (internal quotes omitted). Significantly, a federal court may not grant habeas relief to a state prisoner on a claim

> that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> 1) resulted in a decision that was

[9] These new standards apply to petitions filed after the Act's effective date even though they relate to convictions which predate enactment of the AEDPA. *Williams v. Taylor*, 529 U.S. 362, 402, 120 S. Ct. 1495, 1518 (2000); *Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir. 2001) (citing *Williams*).

> contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S. Ct. 197 (2001); *Boyette*, 246 F.3d at 88. When applying this test, the Second Circuit has noted that

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams v. Taylor,* 529 U.S. 362, 120 S. Ct. 1495 (2000) and *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Because the AEDPA's restriction on federal habeas power was premised in no small part upon the duty of state courts to uphold the

Constitution and faithfully apply federal laws, the AEDPA's exacting review standards apply only to federal claims which have been actually adjudicated on the merits in the state court. *Washington v. Shriver,* 255 F.3d 45, 52-55 (2d Cir. 2001). Specifically, as the Second Circuit explained in *Sellan v. Kuhlman*, "[f]or the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." 261 F.3d 303, 312 (2001); *see Jimenez v. Walker,* 458 F.3d 130, 135 (2d Cir. 2006). Significantly, the Second Circuit further held that when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – *even if the state court does not explicitly refer to either the federal claim or to relevant federal case law."* *Sellan,* 261 F.3d at 312. (emphasis added).[10,11]

---

[10] In the past, when wrestling with interpretation and application of the AEDPA's deference standard the Second Circuit had suggested, although leaving open the question, that deference under section 2254(d) is not mandated if a state court decides a case without citing to federal law or otherwise making reference to a federal constitutional claim in a manner adequate to justify deference under AEDPA, in which case pre-AEDPA standards would apply. *Washington*, 255 F.3d

When a state court's decision is found to be decided "on the merits", that decision is "contrary to" established Supreme Court precedent if it applies a rule that contradicts Supreme Court precedent, or decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 120 S. Ct. at 1523. Moreover, a federal court engaged in habeas review must also determine not whether the state court's determination was merely incorrect or erroneous, but instead whether it was "objectively unreasonable." *Sellan*, 261 F.3d at 315 (quoting *Williams*, 529 U.S. at 409, 120 S. Ct. at 1521 (O'Connor, J.)). The Second Circuit has noted that this inquiry admits of "[s]ome increment of incorrectness beyond error", though "the increment need not be great[.]" *Francis S.,* 221 F.3d at 111.

B. Racial Composition of Jury

---

at 52-55; *see also Noble*, 246 F.3d at 98. That court recently clarified in *Sellan*, however, that the question of whether or not a state court makes specific reference to a constitutional principle is not controlling.

[11] In his opinion in *Sellan*, Chief Judge Walker acknowledged that enlightenment in state court decisions as to the manner of disposition of federal claims presented would greatly enhance a federal court's ability, on petition for habeas review, to apply the AEDPA deference standard. *Sellan*, 261 F.3d at 312. He noted, however, that a state court's failure to provide such useful guidance does not obviate a federal court's duty to make the analysis and pay appropriate deference if the federal claim was adjudicated on the merits, albeit tacitly so. *Id.*

In the first ground of his petition, Walker contends that during jury selection, his constitutional rights were violated through the prosecutor's exercise of peremptory challenges to exclude the only two African-American members of the jury panel. While the petitioner did not challenge the exclusion of the first minority panel member, Dr. Myrna Charles, he did voice an objection after the second, Ms. Barbara Wimbush, was targeted by the prosecution. TT 84. When that objection was registered, the trial court called upon the prosecution to articulate a race-neutral rationale for the exclusion of both potential jurors. TT 85. In response, the assistant district attorney conducting jury *voir dire* explained that the exclusion of Dr. Charles was based upon her practice to "routinely exclude highly educated professionals", including lawyers and doctors. *Id*. The exclusion of the second panel member, Ms. Wimbush, was said to be based upon her name and the possibility, given its uniqueness, that she may have been related to Alvin Wimbush, a known persistent felon, and the lack of an opportunity to conduct a meaningful investigation into that possibility. TT at 85-86. After hearing argument regarding the matter Judge Breslin, expressing familiarity with the prosecutor and her jury impanelment practices,

confirmed that the prosecutor did in fact typically exclude doctors and other similar professionals from jury panels, and thus accepted her explanation for eliminating Dr. Charles.[12] TT 86-87. Acknowledging that the Albany area was not a "large community" and that the spelling of the second excused juror's name was "fairly unique", the trial court credited the prosecutor's race neutral reason for exercising a peremptory challenge to exclude Ms. Wimbush, despite her assurance that neither she nor any of her family members had ever been accused of a crime. TT 87.

The racial jury composition argument now being asserted was raised to and rejected by the Third Department in connection with petitioner's direct appeal of his conviction. That determination is therefore entitled to AEDPA deference.

1. Clearly Established Supreme Court Precedent

For more than forty years it has been well-established that the "purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal

---

[12] In making that observation, Judge Breslin noted that he had presided over between twenty and twenty-five trials prosecuted by that particular assistant district attorney. TT 86.

Protection Clause." *Swain v. Alabama,* 380 U.S. 202, 203-04, 85 S. Ct. 824, 826 (1965). Recognizing and reaffirming that principle in its landmark decision in *Batson v. Kentucky,* 476 U.S. 79, 106 S. Ct. 1712 (1986), the Supreme Court concluded that a defendant who is member of a particular, cognizable racial group and challenges the racial composition of a jury may prevail in establishing a *prima facie* case of discrimination simply by showing the purposeful, race-based exclusion in the selection of jurors from a jury panel, based upon the particulars of his or her case. *Id.* at 95, 106 S. Ct. at 1722.

To assist trial courts in their examination of claims of racial discrimination in connection with jury selection, in *Batson* the Court announced a three-part burden-shifting framework, triggered by the initial objection by a defendant making a *prima facie* showing of circumstances giving rise to an inference that a particular jury panelist has been stricken on improper grounds. *Batson,* 476 U.S. at 96-97, 106 S. Ct. at 1722-23; *Messiah v. Duncan,* 435 F.3d 186, 194-95 (2d Cir. 2006). Once such a *prima facie* showing has been made, the burden of going forward then shifts to the non-moving party to offer a racially neutral explanation for striking the particular potential juror; such

an explanation, it should be noted, "need not be 'persuasive, or even plausible' for the non-movant to meet his obligation at step two of the *Batson* procedure and thereby advance the inquiry to the third step." *Messiah,* 435 F.3d at 195 (citing and quoting *Purkett v. Elem,* 514 U.S. 765, 768, 116 S. Ct. 1769, 1171 (1995)). Once that burden has been met, the focus reverts to the moving party, which must then prove that the reason offered was pretextual and establish, by a preponderance of the evidence, that the peremptory challenge at issue was based on race. *Batson,* 476 U.S. at 97-98, 106 S. Ct. at 1723-24; *Messiah,* 435 F.3d at 195. Importantly, while the burden of production under the *Batson* framework alternates between the parties, the ultimate burden of persuasion remains at all times with the challenging party. *Messiah,* 435 F.3d at 195. And, while the Supreme Court has posited the *Batson,* three step burden shifting framework, it "has explicitly declined to prescribe specific procedures for the conduct of such an inquiry." *Majid v. Portuondo,* 428 F.3d 112, 126 (2d Cir. 2005) (citations omitted).

2. <u>Contrary to or Unreasonable Application of, Supreme Court Precedent</u>

In its decision affirming petitioner's conviction the Third Department, applying *People v. Allen,* 86 N.Y.2d 101, 629 N.Y.S.2d

1003 (1995), left intact the trial court's finding that the prosecution's race-neutral explanation for exercising a peremptory challenge with regard to Betty Wimbush was not a pretext for intentional discrimination.[13,14] 285 A.D.2d at 664, 727 N.Y.S.2d at 735. Recalling that the trial court's findings regarding pretext and lack of racial motivation are presumed to be correct, 28 U.S.C. § 2254(e)(1); *Bryant v. Speckard*, 131 F.3d 1076, 1077 (2d Cir. 1997), and the petitioner bears a heavy burden in challenging those findings, 28 U.S.C. § 2254(e)(1) ("The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."), and

---

[13] While *Batson* is directly applicable to federal criminal trials, in its decision in that case the Court left to the states the task of establishing their own individual procedures for probing claims of intentional discrimination in connection with jury selection. *See Messiah,* 435 F.3d at 203 (Jacobs, J., concurring) (citing *Batson,* 476 U.S. at 90, 106 S. Ct. at 1719). In reviewing New York's established procedure, as formulated in *Allen,* the Second Circuit has concluded that it is not inconsistent with *Batson. Id.* (citing *United States v. Rudas,* 905 F.2d 38, 41 (2d Cir. 1990)).

[14] In its decision, the Third Department appropriately focused principally on the exclusion of Betty Wimbush, apparently in light of petitioner's failure to register a timely challenge to the earlier exclusion of Dr. Myrna Charles. The fact of Dr. Charles' exclusion, however, is far from meaningless; the earlier, unchallenged purposeful exclusion of minority venire members can be a factor informing a trial court's determination, based upon the totality of the circumstances, that the later, challenged exclusion was racially motivated. *Overton v. Newton*, 295 F.3d 270, 277-78 (2d Cir. 2002) ([A] 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." (quoting *Batson*, 476 U.S. at 96-97, 106 S. Ct. at 1723)).

having carefully reviewed the relevant record excerpts, I can find no basis to conclude that the state court's determination was either contrary to or an unreasonable application of clearly established Supreme Court precedent.

Upon receiving petitioner's complaint regarding the exclusion, the trial court appropriately requested that the prosecution furnish a race-neutral explanation for the exercise of a peremptory challenge of a potential juror in question. In the face of that explanation, petitioner's counsel was unable to offer any evidence of racial animus, instead simply attempting to establish bias inferentially by pointing to the fact that the only two minority potential jury members had been excluded, and questioning the explanation given -- arguments which petitioner now reiterates in this habeas petition.

In his memorandum, petitioner contends that the trial court erred in its credibility determination, arguing that "[t]here was not one scintilla of evidence to support the prosecutor's misgivings about Ms. Wimbush." Petitioner's Memorandum (Dkt. No. 2) at 12; *see also* Petitioner's Reply Memorandum (Dkt. No. 8) at 4 ("There was absolutely no evidence to support the prosecutor's hunch that Ms.

Wimbush, contrary to her posture in her answers during the *voir dire* was related to some predicate or persistent felon known to a different prosecutor."). This argument loses sight of the fact that the prosecution's motivation for exclusion need not be grounded in fact; instead, it need only be genuinely held, and race-neutral. *Purkett,* 514 U.S. at 768-69, 115 S. Ct. at 1171-72. Petitioner's argument also fails to appreciate the significance of the fact that while, under *Batson,* the relative burden of going forward is allocated differently at each step of the process, the ultimate burden of persuasion remains at all times with the defendant. *Messiah*, 435 F.3d at 195.

Because it is not this court's place to usurp the trial court's function and reexamine its findings of fact regarding lack of pretext and racial motivation, provided they garner support from the record, I recommend that this ground of Walker's petition be denied.

C. Evidentiary Rulings

Petitioner's second ground for seeking habeas relief deals principally with evidentiary rulings made by the trial court, including 1) a determination in connection with an asserted attorney-client privilege argument which, according to petitioner, effectively precluded his

attorney from offering significant evidence bearing upon the voluntariness of his confession; 2) the exclusion of an affidavit given by Hector DeJesus, his co-conspirator's dying stepfather allegedly exculpating the petitioner in connection with the murder at issue and accepting full responsibility for the killing; and 3) introduction into evidence of a photograph of the victim, alleged by the petitioner to be highly prejudicial.[15]

1. Clearly Established Supreme Court Precedent

When evaluating convictions on collateral, habeas challenges asserting error on the part of a trial court, federal courts historically have inquired whether the trial court's alleged error had a "substantial and injurious effect of influence in determining the jury's verdict." *DeVivo v. Superintendent, Auburn Corr. Facility*, No. 02-CV-0840, 2006 WL 581145, at *18 (N.D.N.Y. March 8, 2006) (Kahn, J.) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 1721-22 (1993)); *see also Moore*, 2005 WL 3591815, at *3 (quoting *Brecht*). With the enactment of the AEDPA, however, it became an open

---

[15] Petitioner's second ground also involves accusations of prosecutorial misconduct. That portion of Walker's claim will be dealt with elsewhere in this report. *See* pp. 37 - 40, *post.*

question in this circuit whether the applicable test on federal habeas review of an alleged state trial court error remains the standard articulated in *Brecht*, or instead should center around whether the state court's decision was contrary to, or an unreasonable application of a far less rigorous test from a petitioner's perspective, articulated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967).[16] *DeVivo*, 2006 WL 581145, at *18 (citing *Benn v. Greiner*, 402 F.2d 100, 105 (2d Cir. 2005) (citation omitted)); *see also Brinson v. Walker*, 407 F. Supp. 2d 456, 480-81 (W.D.N.Y. 2006); *Moore*, 2005 WL 3591815, at *3.

The Second Circuit partially resolved this question in *Gutierrez v. McGinnis*, 389 F.3d 300 (2d Cir. 2004), holding that when a state court explicitly conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied *Chapman*. *DeVivo*, 2006 WL 581145, at *18 (citing *Gutierrez*, 389 F.3d at 306 and *Zappulla v. New York*, 391 F.3d 462, 467 (2d Cir. 2004)); *see also Moore*, 2005 WL 3591815*,* at *4. The Second Circuit has not yet completely filled the void, however, having left undecided the

---

16 In *Chapman*, the Supreme Court articulated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S. Ct. at 828.

question of whether the *Chapman* or *Brecht* test is to be applied where the state court has not performed a harmless error analysis. *See DeVivo*, 2006 WL 581145, at *18; *Moore*, 2005 WL 3591815, at *4; *see also Howard v. Walker*, 406 F.3d 114, 123 (2d Cir. 2005) (citing *Gutierrez*) (other citations omitted); *Brinson*, 407 F. Supp. 2d at 480-81; *Crispino v. Allard*, 378 F. Supp. 2d 393, 406 (S.D.N.Y. 2005) (citations omitted); *Ellis v. Phillips*, No. 04-CIV-7988, 2005 WL 1637826, at *24 n.45 (S.D.N.Y. July 13, 2005 ) (Peck, M.J.) (collecting cases).

In the present case, the Third Department did not engage in harmless error analysis when reviewing petitioner's claims alleging trial court error. *Walker,* 285 A.D.2d at 661-64, 727 N.Y.S.2d at 733-35. Instead, the Third Department determined that Moore's contentions lacked merit and the County Court had not erred in any of the challenged rulings. *Id.* In view of the uncertainty within this circuit, I will examine the issues now raised by petitioner regarding these claims, utilizing both standards to address and perceived trial court errors to determine whether they can properly be regarded as harmless. *See Moore*, 2005 WL 3591815, at *4.

2. <u>Contrary to, or Unreasonable Application of, Supreme Court Precedent</u>

In its decision affirming petitioner's conviction, the Third Department summarily disposed of petitioner's evidentiary challenges, succinctly noting that it had considered those claims but found "that none warrants any further discussion or reversal of the judgment of conviction." 285 A.D.2d at 664, 727 N.Y.S.2d at 735.

a. Attorney-Client Privilege

At trial, the defense sought to elicit testimony from an attorney who formerly represented the petitioner. TT 913. According to an offer of proof, that attorney would have testified to having observed, on the day following Walker's confession, marks on his wrists where handcuffs would have been applied. *Id.* According to the defense, this testimony would have been offered to bolster petitioner's claim that his confession was involuntary. TT 914. After hearing argument regarding the issue, while not explicitly precluding the defendant from calling his former counsel to testify, the trial court concluded that the proffered testimony would open the door and permit the prosecution to probe any other observation by the witness regarding the questioning of the petitioner in general. TT 915. In support of his argument on this ground, petitioner now characterizes the trial court's ruling as indicating that by seeking

testimony only as to the attorney's observations, the attorney-client privilege would be waived, thereby squarely presenting a dilemma for the petitioner in deciding whether or not to call his former attorney.

While clearly such a ruling would have been erroneous, since the mere fact that an attorney testifies factually as to his or her observations does not constitute a waiver of the attorney-client privilege, and thereby open the door to cross examination regarding privileged communications, *Clanton v. United States,* 488 F.2d 1069, 1070-71 (5th Cir. 1974), *cert. denied*, 419 U.S. 877, 95 S. Ct. 140 (1974), this was not the primary thrust of the trial court's ruling. Instead, the trial court merely noted, quite properly, that if testimony regarding the lawyer's observations were elicited, then the prosecution would be entitled to examine the attorney regarding any other observations that might inform the question of voluntariness. While attorney-client privilege was mentioned, at least by the prosecution, during discussion of the issue, the clear tenor of the trial court's ruling is to the effect that once the proffered testimony was elicited, the prosecution would be free to inquire regarding the attorney's other observations with respect to the

questioning.[17] TT 915. After the ruling, the defense determined not to call the witness in question to testify.

While the trial court's ruling is ambiguous, and may suggest a finding of waiver would be associated with the proffered testimony, there is no indication that the potentially erroneous portion of the trial court's ruling was pivotal to the decision not to call peitioner's former counsel to testify. The import of the proffered testimony from petitioner's former defense counsel was to be that he was handcuffed unduly tightly and that this was a factor which led to his having involuntarily confessed to the Soto murder. It should be noted,

---

[17] The trial court's ruling is stated in the following two excerpts:

> The Court: Wait a minute. What are his observations and what is his interaction that first day as it relates to voluntariness? What was his appearance? Gee, they beat me with a rubber hose. She can't ask about that?
>
> * * *
>
> The Court: If you ask that, she has the full opportunity to ask, What did they do to you? How did they abuse you? Do you have any notes, Mr. Treece, with regard to what that first interview was? If you are not prepared for that - that's what I am going to allow.

TT 915. Unfortunately, the petitioner's counsel did not press the trial court for clarification, and the record is less than precise regarding whether, and if so to what extent, the petitioner's decision to call his former counsel as a witness would have resulted in a trial court finding of waiver of the attorney-client priviledge.

however, that Walker testified at trial, and indeed to having been both handcuffed and shackled. *See*, e.g, TT 941-42, 948, 954, 958. Petitioner also testified that the handcuffs were placed too tightly on his wrists, resulting in his experiencing cuts, although he did not explicitly state that they were so tightly applied that he felt compelled to confess to the Soto murder in order to avoid further such treatment. TT 1027. Given that the petitioner, in the face of the trial court's ruling, opted not to call the former defense attorney in question as a witness, and that in any event his testimony would have been merely cumulative on but a small point of what was otherwise a well-developed record regarding the circumstances surrounding petitioner's questioning, I am unable to conclude that the trial court's ruling deprived petitioner of an unfair trial, and further find that if there was trial court error on this issue, it was harmless beyond a reasonable doubt.

b. Exculpatory Statement

The second trial court error urged by the petitioner relates to the exclusion of an affidavit from Hector DeJesus, who apparently is co-conspirator Andre Roldan's stepfather, absolving Roldan and petitioner

of involvement in the murder.[18] In the face of a hearsay objection, at trial petitioner urged that the affidavit was admissible as a statement against penal interest. That argument was rejected by the trial court, based upon the trial court's finding that the statement lacked the requisite indicia of reliability. TT 15-20.

The exclusion of the DeJesus declaration offered by the petitioner implicates additional, relevant precedent. "[I]t is axiomatic that all criminal trials must be conducted within the bounds of fundamental fairness." *Gayle v. Scully,* 779 F.2d 802, 805 (2d Cir. 1985) (citing *Taylor v. Hayes*, 418 U.S. 488, 501-02, 94 S.Ct. 2697, 2704-05 (1974)) (other citations omitted), *cert. denied*, 479 U.S. 838, 107 S.Ct. 139 (1986). Moreover, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049 (1973). In exercising this right, however, the criminal defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* While the propriety of the rules prohibiting the use of hearsay evidence

---

[18] The DeJesus Affidavit is included among the state court records which were furnished by respondent's counsel to this court. *See* RA I at 77.

is unquestioned,[19] "exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed." *Id.* Where the evidence offered by a criminal defendant bears "persuasive assurances of trustworthiness," the refusal of a court to allow such evidence to be offered by a defendant in defense to the criminal charges violates that party's right to a fair trial. *Id.*

When addressing the issue, Judge Breslin noted his prior experiences with DeJesus, who he characterized as not particularly credible, and found that in light of the fact that DeJesus was both dying at the time the statement was given and facing sentencing as a persistent felony offender – later resulting in imposition of a sentence of

---

[19] As the Supreme Court has noted:

> The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of- court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.

*Chambers*, 410 U.S. at 298, 93 S.Ct. at 1047 (citing *California v. Green*, 399 U.S. 149, 158, 90 S. Ct. 1930, 1935 (1970)).

incarceration of between twenty-five years and life – the statement was not credible.[20] The determination of whether to admit the disputed statement, despite constituting hearsay and the fact that the prosecution would be unable to cross examine the declarant, was a decision entrusted to the trial court's discretion. *Johnson v. Artuz*, No. 00-CV-61006T, 2006 WL 1144513, at *8 (W.D.N.Y. May 1, 2006) (citing *United States v. Jackson*, 335 F.3d 170, 179 (2d Cir. 2003)). Finding no basis to find the DeJesus statement bears "persuasive assurances of trustworthiness," I am unable to conclude the trial court committed an error, much less one of constitutional proportions, in excluding the disputed statement.[21]

C. Photograph of Victim

The last aspect of petitioner's evidentiary rulings challenge concerns admission into evidence of a photograph of the victim. Because the photograph depicts the victim on vacation, petitioner

---

[20] It should be noted that later during the trial, Roldan testified that while being transported in late 1996 to court for an appearance, he advised the petitioner that his father, Hector DeJesus, had offered to "take the weight" for the two of them. TT 282.

[21] It is noteworthy that in his memorandum, petitioner acknowledges the possibility that the trial court's evidentiary ruling was on this issue "technically correct," arguing that exclusion of the statement nonetheless rendered his trial "fundamentally unfair." Petitioner's Memorandum (Dkt. No. 2) at 16.

attributes its introduction to an attempt by the prosecutor appeal to the emotions of the jury.[22]

The type of evidentiary claim which is raised with regard to the trial court's decision to admit the subject photograph into evidence requires the court to determine whether the photographs had a substantial and injurious effect or influence in determining the juror's verdict or, in the alternative, whether the Third Department unreasonable applied clearly established Supreme Court precedent when it found this aspect of petitioner's appeal without merit. *E.g., Alfini v. Lord,* 245 F. Supp. 2d 493, 499-500 (E.D.N.Y. 2003).

This case is readily distinguishable from those in which gory crime scene photographs, offered in a transparent attempt to arouse emotions of the jury, are involved. *See People v. Pobliner,* 32 N.Y.2d 356, 370 (1973), *cert. denied,* 416 U.S. 905, 94 S. Ct. 1609 (1974). While not having been provided the photograph in dispute, I nonetheless conclude that this court is positioned, based upon its description, to find that it comes nowhere near the category of those photographs offered

[22] The prosecution claims to have offered the disputed photograph in order to provide a basis for comparison of the relative sizes of the petitioner and the deceased. TT 169-70.

solely for the purpose of arousing jury sympathy, and thereby having a prejudicial and injurious effect upon the trial's outcome. Accordingly, I recommend that this portion of petition be denied.

D. Prosecutorial Misconduct

In his second ground for relief, petitioner also asserts prosecutorial misconduct, based upon statements made during the district attorney's summation, as a basis for habeas relief. According to the petitioner, during her closing statement the prosecutor alluded to an earlier, 1984 juvenile adjudication of murder, in direct contravention of an earlier ruling from the trial court. Petitioner also points to a comment by the prosecutor regarding petitioner's alibi witness, asserting in essence that she was "foolish enough" to have feelings for the petitioner and that Walker was "smart enough to exploit" those feelings. Lastly, petitioner challenges the prosecution's comments implicating his son and "denigrat[ing] him for being involved in his own defense" as well as appealing to the jury's emotions by stating that petitioner had denied his victim "an opportunity to confess to God and to say goodbye." Petition (Dkt. No. 1) at 8-9. Petitioner registered timely objections to these comments, and additionally moved for a mistrial;

both the objections and his mistrial motion were denied by the trial court. TT 1360-66.

1. Clearly Established Supreme Court Precedent

"In evaluating a claim of prosecutorial misconduct in a petition for habeas corpus relief, the appropriate standard of review is whether the prosecution engaged in 'egregious misconduct ... amounting to a denial of constitutional due process rights.'" *Samper v. Greiner,* No. 00 CIV. 1401, 2002 WL 334466, at *6 (S.D.N.Y. Mar. 1, 2002) (quoting *Blissett v. Lefevre,* 924 F.2d 434, 440 (2d Cir. 1991)). To warrant habeas relief, the prosecutorial misconduct must cause the defendant "substantial prejudice" by " 'so infecting the trial with unfairness as to make the resulting conviction a denial of due process.' " *United States v. Shareef,* 190 F.3d 71, 78 (2d Cir. 1999) (quoting *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471 (1986)); *Samper*, 2002 WL 334466, at *6.

The prosecutorial misconduct claim asserted by the petitioner was dispensed with by the Third Department in its summary rejection of the various "other" arguments raised on appeal. Having carefully reviewed the trial record, and in particular the prosecutor's summation, I am

unable to find that the cited instances of misconduct arose to a level of constitutional significance. *Chase v. Berbary,* 404 F. Supp. 2d 457, 466 (W.D.N.Y. 2005) (finding no constitutional violation even though "prosecutor's remarks on summation . . . denigrated the defense, were inflammatory, improperly referred to God and religion, improperly commented on defendant's request to consult with an attorney, and vouched for the credibility of the People's witnesses"); *Scott v. Walker*, No. 01-CV-7717(JG), 2003 WL 23100888, at *9 (E.D.N.Y. Dec. 30, 2003) (finding that petitioner's prosecutorial misconduct claim was "meritless" where, in summation, the prosecutor stated that the petitioner committed "an exceptionally brutal and heinous crime"); *Hunter v. Filion*, No. 01-CV-0992 (JBW), 2003 WL 22953073, at *5-*6 (E.D.N.Y. Oct. 22, 2003) (finding no constitutional violation where prosecutor characterized the petitioner as a "punk" in her opening statement); *Morgan v. Senkowski*, No. 97-CV-2217, 2003 WL 22170600, at *7 (E.D.N.Y. Aug. 18, 2003) (finding no constitutional violation where prosecutor described the petitioner as "vicious and brutal" and "greedy"); *McRae v. New York*, 271 F. Supp. 2d 402, 408 (E.D.N.Y. 2003) (finding no constitutional violation despite "the sarcastic

and belittling tone employed by the prosecutor during this summation"). Accordingly, I recommend that this last portion of the second ground of Walker's petition be denied.

E. Failure to Suppress Confession

_____In his third and final ground, petitioner asserts that his admission of complicity in the Soto murder was involuntarily, and that the questioning led up to his confession resulted in a denial of his right to counsel, and that the trial court should therefore have suppressed his statement prior to trial. This argument comprises both a Fifth Amendment claim, focusing on voluntariness, and a Sixth Amendment right to counsel claim.

1. Clearly Established Supreme Court Precedent

a) Voluntariness

Under *Miranda,* "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed.'" *Stansbury v. California*, 511

U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966)). In considering whether a party has voluntarily provided a statement to the police, courts are to consider the "totality of the circumstances," including evidence of police coercion, the length of the interrogation, the defendant's maturity and education, and whether the police failed to advise the defendant of his rights to both remain silent and to have counsel present during the custodial interrogation. *Withrow v. Williams,* 507 U.S. 680, 693-94, 113 S. Ct. 1745, 1754 (1993); *see also Colorado v. Spring,* 479 U.S. 564, 573, 107 S. Ct. 851, 857 (1987).[23] In determining whether a statement was coerced, a court must "examine[] 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession[,] . . . tak[ing] into consideration 'the totality of all the surrounding circumstances –both the characteristics of the accused and the details of the interrogation.'" *Dickerson v. United States,* 530 U.S. 428, 434, 120 S. Ct. 2326, 2331 (2000) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.

---

[23] A coerced or otherwise involuntary statement may never be used for any purpose: "*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law . . . ." *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S. Ct. 2408, 2416 (1978) (emphasis in original).

Ct. 2041, 2047 (1973)).

Considered against this backdrop, a careful review of the relevant record excerpts reflects that petitioner's voluntariness argument was neither presented to nor addressed by the Third Department in connection with the appeal of his conviction. Petitioner has therefore failed to fulfill his duty to exhaust available state remedies before seeking habeas relief. *Aparicio v. Artuz,* 269 F.3d 78, 89 (2d Cir. 2001); *see* 28 U.S.C. § 2254(b)(1). Since petitioner is entitled to only one direct appeal, and that appeal has been taken, the court may properly deemed the voluntariness claim to be exhausted since "it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile." *Aparicio,* 269 F.3d at 90 (citing *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997)).

Although petitioner's voluntariness claim is deemed exhausted, it is also procedurally forfeited. *See Aparicio,* 269 F.3d at 90, 96. Accordingly, a federal court may not engage in habeas review of the claim unless the petitioner demonstrates either 1) both good cause for and actual prejudice resulting from his procedural default, or 2) that the denial of habeas relief would leave unremedied a fundamental

miscarriage of justice. *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000); *Garcia v. Lewis*, 188 F.3d 71, 76-77 (2d Cir. 1999); *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995). Under this second exception, which is both exacting and intended for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent[,]" *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986); *see also House v. Bell*, ___ U.S. ___, 126 S. Ct. 2064, 2076 (2006); *Lebron v. Mann*, 40 F.3d 561, 564 (2d Cir. 1994), "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray*, 477 U.S. at 495, 106 S. Ct. at 2649 (quoting *Engle v. Isaac*, 456 U.S. 107, 135, 102 S. Ct. 1558, 1576 (1982)).

To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with the relevant procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S. Ct. 2546, 2566-67 (1991) (citing *Murray*, 477 U.S. at 488, 106 S. Ct. at 2645); *Restrepo v. Kelly*, 178 F.3d 634, 639 (2d Cir. 1999) (citing, *inter alia*, *Coleman*). Examples of

such external mitigating circumstances can include "interference by officials," ineffective assistance of counsel, or that "the factual or legal basis for a claim was not reasonably available" at trial or on direct appeal.[24] *Murray*, 477 U.S. at 488, 106 S. Ct. at 2645. When a petitioner has failed to establish adequate cause for his or her procedural default, the court need not go on to also examine the issue of prejudice, since federal habeas relief is generally unavailable as to procedurally defaulted claims unless both cause and prejudice are demonstrated. *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Long v. Lord*, No. 03-CV-0461, 2006 WL 1977435, at *6 (N.D.N.Y. March 21, 2006) (McCurn, S.J.) (citing *Stepney*); *Staley v. Greiner*, No. 01 Civ. 6165, 2003 WL 470568, at *7 (S.D.N.Y. Feb. 6, 2003) (citing *Stepney*). In such a case, absent evidence to show the petitioner's innocence of the crime of conviction, no basis is presented to conclude that the failure to consider the merits of the federal claim would result in a fundamental miscarriage of justice, which has been interpreted as

[24] It should be noted, however, that "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Coleman*, 501 U.S. at 753, 111 S. Ct. at 2566-67 (quoting *Murray*, 477 U.S. at 488, 106 S. Ct. at 2645.

amounting to "an unjust incarceration." *Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir. 2000).

In this instance, I find no basis in the record to conclude either that there was good cause to excuse petitioner's default, or that he is actually innocent of the offense charged. Accordingly, I recommend that the court not consider the merits of his voluntariness claim as it relates to the confession given by him to the Soto murder.

b) Right to Counsel

The Sixth Amendment provides that "[i]n all criminal proceedings, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI. Under well-established Supreme Court jurisprudence, the Sixth Amendment right to counsel attaches at the "initiation of adversary judicial proceedings–whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S. Ct. 1877, 1882 (1972); *see also Brewer v. Williams*, 430 U.S. 387, 398, 97 S. Ct. 1232, 1239 (1977). (citations omitted). "[O]nce this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective." *McNeil v. Wisconsin*,

501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991) (*citing Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404 (1986)). The Sixth Amendment right to counsel, however, is "offense specific." *McNeil*, 501 U.S. at 175, 111 S. Ct. at 2207. Accordingly, "[i]t cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced . . . ." *Id*. "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Maine v. Moulton*, 474 U.S. 159, 180 n.16, 106 S. Ct. 477, 489 n.16 (1985). The rationale for recognizing this limit on the right to counsel is that

> [t]he police have an interest . . . in investigating new or additional crimes [after an individual is formally charged with one crime.] . . . [T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities . . . .

*McNeil*, 501 U.S. at 175-76, 111 S. Ct. at 2207-08 (alterations in original) (quoting *Moulton*, 474 U.S. at 179-80, 106 S. Ct. at 488-89).

The legal concept implicated in this case is illustrated by the

Court's decision in *McNeil.* There, the defendant was arrested for armed robbery, and was represented by a public defender at his initial appearance in connection with that charge. 474 U.S. at 173, 111 S. Ct. at 2206. Following that initial appearance, the defendant was transported to jail, where a detective visited and questioned him about a murder, attempted murder, and burglary unrelated to the armed robbery for which the defendant had been charged. *Id*. At that point, the defendant waived his *Miranda* rights, but denied involvement in the crimes under investigation. *Id*. at 173-74, 111 S. Ct. at 2206. Two days later, the defendant was again visited by detectives and interrogated about the uncharged crimes. *Id*. at 174, 111 S. Ct. at 2206-07. During the course of that interview, the defendant, after once again waiving his *Miranda* rights, admitted that he was involved in the crimes under investigation. *Id*. at 174, 111 S. Ct. at 2207. After giving that confession, the defendant was charged with and convicted of second-degree murder, attempted first-degree murder, and armed robbery. *Id*.

In his petition for *certiorari* review, the defendant contended that his confession was obtained in violation of his right to counsel and that

it therefore should have been suppressed at trial. *McNeil*, 474 U.S. at 174-75, 111 S. Ct. at 2207. The Supreme Court squarely rejected this argument, holding that "[b]ecause petitioner provided the statements at issue here before his Sixth Amendment right to counsel with respect to [the charges unrelated to the initial armed robbery] had been (or even could have been) invoked, that right poses no bar to the admission of the statements in this case." *Id*. at 176, 111 S. Ct. at 2208.

Following the issuance of the Court's decision in *McNeil*, some federal and state courts enlarged upon the "offense specific" definition of the Sixth Amendment right to counsel, extending the right to crimes that are "'factually related' to a charged offense." *Texas v. Cobb*, 532 U.S. 162, 168, 121 S. Ct. 1335, 1340 (2001) (citations omitted). In *Cobb*, the Supreme Court rejected this enlargement of *McNeil*, holding that because the Sixth Amendment right to counsel is "offense specific," the right to counsel does not extend to "crimes that are 'factually related' to those that have actually been charged . . . ." *Id*. at 167, 121 S. Ct. at 1340.

The Court's decision in *Cobb* provides useful guidance in determining how the critical differentiation applies in this instance. In

*Cobb*, the defendant confessed to burglarizing a house that was occupied by a mother and her young daughter, but denied involvement in the disappearance of the mother and daughter. 532 U.S. at 165, 121 S. Ct. at 1339. The defendant was subsequently charged with burglary, and counsel was appointed to represent him on that charge. *Id*. More than a year later, while the defendant was free on bond in the burglary case, his father contacted the police to report that his son had confessed to him that he had killed the mother and daughter while burglarizing their home. *Id*. Based upon this information, the police took the defendant into custody where, after waiving his *Miranda* rights, he confessed to murdering the mother and daughter during the burglary. *Id*. at 165-66, 121 S. Ct. at 1339. The defendant was tried and convicted of capital murder. *Id*. at 166, 121 S. Ct. at 1340. On appeal, the defendant contended that because the capital murder charge was factually related to the burglary charge, his right to counsel had attached when he was appointed counsel for the burglary charge. *Id*. Rejecting this argument, the Supreme Court held that because "[a]s defined by Texas law, burglary and capital murder are not the same offense," the "Sixth Amendment right to counsel did not bar police from

interrogating [defendant] regarding the murders, and [defendant's] confession was therefore admissible." *Id*. at 173, 121 S. Ct. at 1344.

In *Cobb* the Supreme Court set out the parameters for what is to be considered an "offense" for Sixth Amendment purposes. The Court recognized that the "definition of an ‘offense' is not necessarily limited to the four corners of the charging instrument." 532 U.S. at 173, 121 S. Ct. at 1343. Accordingly, the Court held that "when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the [test articulated in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180 (1932)]." *Id.* Under the *Blockburger* test, "‘where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses, or instead only one, is whether each provision requires proof of a fact which the other does not.'" *Id.* (quoting *Blockburger*, 284 U.S. at 304, 52 S. Ct. 180). Thus, the Sixth Amendment "prevents discussion of charged offenses as well as offenses that, under *Blockburger*, could not be the subject of a later prosecution." *Id*. at 173 n.3, 121 S. Ct. at 1343 n.3. The Court flatly rejected the argument that

the term "offense" should be construed more broadly to include "criminal acts that are 'closely related to' or 'inextricably intertwined with' the particular crime set forth in the charging instrument." *Id.* at 186, 121 S. Ct. at 1350 (Breyer, J., dissenting).

2. Contrary to or Unreasonable Application of, Supreme Court Precedent

In its decision, the Third Department addressed the argument now raised, finding no violation of petitioner's right to counsel, and specifically noting that

> the brief questioning about the Staten Island crimes was discrete or fairly separable from the questioning about the murder, and was neither purposely exploitive nor designed to add pressure on defendant to confess to the murder.

285 A.D.2d at 664, 727 N.Y.S.2d at 735. That determination was based upon the Third Department's finding that the questioning which led to petitioner's murder conviction occurred at a point when he was no longer in custody on the Staten Island charges, in connection with which he was represented by counsel. 285 A.D.2d at 662, 727 N.Y.S.2d 731 at 734. Based upon these findings, the state appellate court held that petitioner's right to counsel was abridged only if his situation were deemed to fall within one of two exceptions recognized

under New York law, either because the two matters "are so closely related transactionally, or in space or time, that questioning on the unrepresented manner would all but inevitably elicit incriminating responses regarding the matter in which there had been an entry of counsel[,]" or questioning in the first, unrelated matter was "purposely exploitive" and "designed to add pressure on defendant to confess" to the unrepresented crime, concluding that neither of those exceptions applied.[25] *Id.* at 663-64, 727 N.Y.S.2d at 734-35 (citations omitted).

Recognizing, once again, that the trial court's findings on these issues are presumed correct and entitled to considerable deference, I am unable to conclude that the Appellate Division's determination was either contrary to or represents an unreasonable application of clearly

---

25 The Third Department's analysis was made principally under the state constitution and governing state court authority. That the protections afforded under New York law are considerably more expansive than those to which a suspect is entitled under the Sixth Amendment is apparent from a comparison of caselaw under the two. *Compare*, *e.g*. *People v. Cohen*, 90 N.Y.2d 632, 639 (1997) (recognizing the right to counsel for an uncharged crime when it is "thoroughly interrelated" with a charged crime) with *Cobb*, 532 U.S. at 166, 121 S. Ct. at 1340 (holding that the right to counsel does not extend to "crimes that are 'factually related' to those that have actually been charged . . .").; *see People v. Bing*, 76 N.Y.2d 331, 351, 558 N.E.2d 1011, 1023 (1990) (Kaye, J., concurring as to result in *Bing* and *Medina*, and dissenting as to *Cawley*) ("Over the past several decades, this court applying the New York State Constitution evolved a body of law that 'constitute[s] the strongest protection of right to counsel anywhere in the country.'" (quoting Peter J. Galie, *The Other Supreme Courts: Judicial Activism Among State Supreme Courts*, 33 Syracuse L. Rev. 731, 764 (1982)).

established Supreme Court precedent. Petitioner's argument that his right to counsel was violated when he was questioned regarding the subject murder at a time when he was represented on unrelated charges lacks merit. "The Sixth Amendment right to counsel is offense specific. That [a defendant has] counsel on [an] earlier . . . case [does] not mean that his Sixth Amendment right [has] attached with respect to [subsequent, unrelated charges]." *Key v. Artuz,* No. 99-CV-161 JG, 2002 WL 31102627, at *4 (E.D.N.Y. Sept. 16, 2002) (citing *Cobb*, 532 U.S. at 168, 121 S. Ct. 1335).

Here, as in *Cobb*, there appears to be some nexus between the murder charge and at least some of the crimes for which the petitioner was assigned counsel in Staten Island. While there was never evidence offered definitively liking any of the guns seized from petitioner's apartment to the Soto murder, and leading to weapons possession charges, the prosecution clearly argued that inferentially, one of them could well have been the murder weapon. This connection, however, is not sufficient to implicate the petitioner's right to counsel on the murder charge. As defined by New York penal law, the drug and weapons charges were not the same offense as the murder

charge. *Compare* N.Y. Penal Law § 265.02 (requiring that person unlawfully possess a weapon) with N.Y. Penal Law §125.27 (requiring that person intentionally cause the death of another person). The mere fact that the firearms seized from petitioner's Staten Island apartment could have been capable of firing the fatal bullet does not establish a sufficient nexus to the Soto murder as to implicate the right to counsel in connection with questioning regarding that offense. Accordingly, under the applicable offense-specific analysis as informed by the Court's decisions in *McNeil* and *Cobb*, the law enforcement officials in this case did not offend the defendant's Sixth Amendment right to counsel. I therefore recommend that his motion to suppress on the ground that his confession was obtained in violation of his Sixth Amendment right to counsel be denied.

In this instance, there is no evidence to suggest that petitioner had invoked his right to counsel at the time of his questioning in Albany regarding the subject murder. Accordingly, the petitioner has failed to sustain his burden of establishing a constitutional violation, and the Third Department's decision is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## IV. SUMMARY AND RECOMMENDATION

Having carefully reviewed the record in the light of petitioner's three asserted grounds for habeas relief, considered in light of the requisite deferential standard owed to the state appellate court's rejection of those claims, I find that none of them contains merit. Accordingly, it is hereby

RECOMMENDED that the petition in this matter be DENIED and DISMISSED in all respects.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

The clerk is directed to promptly forward copies of this order to the parties in accordance with this court's local rules.

Dated: March 2, 2007
Syracuse, NY

David E. Peebles
U.S. Magistrate Judge